**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ELIZABETH WEBER** : | |
| : | **CIVIL ACTION NO. 3:12-0399** |
| **Plaintiff** : | |
| : | **(JUDGE MANNION)** |
| **v.** : | |
| : | |
| **COMMUNITY MEDICAL CENTER** : | |
| : | |
| **Defendant** : | |

## MEMORANDUM

Pending before the court is the defendant's motion for summary judgment with respect to all of the plaintiff's claims for relief. (Doc. 45). Based on the court's review of the motion and related materials, the defendant's motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

The following are the undisputed facts material to resolving the defendant's motion for summary judgment.[1] The plaintiff, Elizabeth Weber, worked at the defendant hospital, Community Medical Center ("CMC"), as an

---

[1] The relevant facts are taken from the pleadings, (Doc. 1; Doc. 7), the defendant's statement of material facts, (Doc. 47), the plaintiff's statement of material facts, (Doc. 52), and both parties' corresponding evidentiary exhibits. Any facts that remain in dispute are noted as such.

x-ray technologist from 1979 to 2005 and as a computerized tomography ("CT") scan technician from 2005 until her discharge on August 26, 2009. (Doc. 1; Doc. 7). As a CT scan technician, Weber was generally responsible for preparing patients for CT scans and performing the scans. (Doc. 47). Weber recognized that part of her job responsibilities was to show kindness and compassion toward patients at CMC, ensuring they felt comfortable, safe, and secure. (*Id.*). Weber reported directly to Joan Ewins, who in turn reported to Robert Bonczek. (*Id.*). In addition to Bonczek, two other CMC managers, Lois Wolfe and Barbara Bossi (collectively, the "CMC management"), were responsible for hiring and firing decisions at the hospital. (*Id.*).

In September 2006, at forty-eight years old, Weber was diagnosed with psoriatic arthritis, psoriasis, and ankylosing spondylitis. (Doc. 1). These conditions caused Weber to suffer from visible head-to-toe skin lesions, swelling of the joints and skin, back and joint pain, and muscle stiffness. (Doc. 52-5). Weber immediately informed Ewins, her direct supervisor, about her medical conditions. (*Id.*). While the skin lesions were noticeable and apparent to many of Weber's coworkers, the parties dispute whether Bonczek, Wolfe, and Bossi were aware of Weber's medical conditions. (Doc. 47; Doc. 52).

On January 21, 2009, Weber received an employee performance evaluation from Ewins. (Doc. 52-1). Weber's evaluation first scored her

performance on eleven distinct professional traits that CMC seeks in its employees. (*Id.*). On two of these traits, Weber's listed score was "Role Model (Exceeds Expectations)," and on the remaining nine traits, her score was "Solid Contributor (Meets Expectations)." (*Id.*). On the written portion of the evaluation, however, Ewins claimed that "[a]lthough [Weber] has been a very productive employee, I believe she needs to work on her patient skills even further . . . [h]er perception of her actions toward patients may not always be how the patients [are] interpreting their care . . . I would like [her] to try to reevaluate her process with patient care and try to make sure that patients are not feeling rushed." (*Id.*). Weber signed the performance evaluation form, acknowledging its assessment. (Doc. 47).

In early August 2009, the CMC management received in rapid succession three separate complaints from patients about Weber. CMC alleges that these three incidents prompted Weber's eventual discharge from her post, but Weber disputes this and challenges some of the factual circumstances surrounding the alleged incidents. (Doc. 52). On August 4, 2009, the adult daughter of an elderly patient submitted the first complaint, asserting that the CT scan technician who had assisted her father pulled a strip of medical tape off the patient's forehead with enough force to cause him pain and leave a red mark across his head. (Doc. 47-9). Further investigation

into this incident revealed that both Weber and another CT scan technician, Gretchen Gabriel, had assisted with this patient's CT scan on the evening in question. (Doc. 47; Doc. 52). Factual disputes thus remain regarding whether it was Weber or Gabriel who actually removed the tape from the patient's forehead. (Doc. 47-11; Doc. 52-5).

One day later on August 5, 2009, CMC received a second complaint from a trauma patient who had been in a motorcycle accident, alleging that an unspecified CT scan technician "was rough in moving" him, was "rude" and "mean" to him, and "lacked compassion." (Doc. 47-13; Doc. 47-15). CMC's records indicated that only Weber was scheduled to work in the CT department on the evening when this particular patient was seen, but Weber rebuts this with her own testimony, asserting that another CT scan technician, Stephanie Danchak, had assisted her with this patient's CT scan. (Doc. 52-5). Weber further testified that the "combative" patient was initially "flailing his arms and . . . punching the machine" but ultimately calmed down and cooperated with the procedure. (*Id.*). While Danchak's own testimony largely corroborates Weber's version of these events, disputes of material fact nonetheless remain on the question of whether Weber acted improperly toward this patient. (Doc. 52-19).

The next day on August 6, 2009, Weber approached Debbie Powell, a human resources analyst at CMC, for information on whether CMC's employee medical insurance would cover the cost of medications for Weber's ailments. (Doc. 1). Powell's direct supervisor was Wolfe, who was also one of the decision-makers in Weber's eventual termination. (*Id.*).

On August 8, 2009, while CMC was still investigating the first two patient complaints against Weber, the hospital received a third complaint from the daughter of a patient who believed that Weber had coerced her into signing a medical consent form for her mentally incapacitated father. (Doc. 47; Doc. 52). She explained that she "felt bullied" into signing the form, especially after Weber purportedly told her to "[j]ust sign the consent!" (Doc. 47-17). Weber suggests that she was simply trying to "reduce" the essential facts surrounding the consent form to the "simplest terms" because the patient's daughter did not "seem to understand" much of what was being said. (Doc. 52-5).

Shortly thereafter, Bonczek met with Wolfe and Bossi to review the three complaints lodged against Weber, and collectively, the CMC management decided to terminate Weber's employment. (Doc. 47; Doc. 52). The reasons for their decision were summarized in a written notice dated August 26, 2009, which claimed that Weber's "unprofessional, aggressive behavior" was "detrimental to . . . the health care system," a "safety risk to . . . patients," and

a "serious violation of [CMC's] Code of Conduct."[2] (Doc. 47). Weber's discharge was made effective on August 29, 2009. (*Id.*).

Weber maintains that CMC's stated reasons for her termination were a mere pretext for unlawful discrimination based on her age and disability. (Doc. 52). On February 11, 2010, Weber filed timely administrative charges of discrimination with both the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). (Doc. 1). On August 15, 2011, the PHRC issued a finding of "no probable cause" for Weber to pursue remedies against CMC. (Doc. 47). On December 19, 2011, however, the EEOC issued a "Notice of Right to Sue." (Doc. 1).

On March 1, 2012, Weber filed the instant action against CMC, bringing both federal and state claims for relief: Count I for alleged discrimination based on age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §623(a); Count II for alleged discrimination based on

---

[2] CMC's "Human Resources Policy and Procedure Manual" states, in relevant part, that "employees are employed at will" such that any "[d]isruptive, discourteous, and/or offensive behavior" toward patients "will not be tolerated and will result in disciplinary action up to and including termination." (Doc. 47-20). This same document, however, goes on to state that "[i]n disciplinary cases, termination will be for specific cause" and that "[e]xcept in cases where the violation is a serious offense, [CMC] shall make every attempt to counsel the employee in a proactive and corrective manner prior to resorting to termination." (Doc. 52-11).

disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12112(a); Count III for alleged discrimination based on age in violation of the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT. §955(a); and Count IV for alleged discrimination based on disability in violation of the PHRA, 43 PA. CONS. STAT. §955(a). (*Id.*). On May 8, 2012, CMC filed its answer, (Doc. 7), to the alleged claims for relief. The parties then engaged in fact discovery, and on November 7, 2016, CMC moved for summary judgment as to all counts in Weber's complaint, arguing that CMC is entitled to judgment as a matter of law because Weber has failed to present sufficient evidence from which a jury could reasonably conclude that her termination resulted from unlawful discrimination. (Doc. 45; Doc. 46). On December 15, 2016, Weber filed her brief in opposition to CMC's summary judgment motion. (Doc. 53). On January 13, 2017, CMC filed a reply brief. (Doc. 56). This matter has been fully briefed and is now ripe for summary judgment.

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is

"genuine" if a reasonable jury could return a verdict for the non-moving party, and it is "material" if proof of its existence or nonexistence would affect the outcome of the trial under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-57 (1986); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

To determine whether a genuine dispute of material fact exists, the court should consider the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). In doing so, the court must view all the evidence and any inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000)). However, the court's function at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. *See also Marino v.*

- 8 -

*Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (noting that the court may neither weigh the evidence nor make credibility determinations).

Parties seeking to establish that a fact is or is not genuinely disputed may not rely on unsubstantiated allegations; rather, they must support such assertions by "citing to particular parts of materials in the record" to demonstrate that the adverse party's factual assertion either lacks support from cited materials or is unsupported by admissible evidence. Fed. R. Civ. P. 56(c)(1). *See also Celotex Corp.*, 477 U.S. at 324 (requiring evidentiary support for factual assertions made during summary judgment). A party's failure to properly support or contest an assertion of fact may result in that fact being considered undisputed for purposes of the summary judgment motion, although the court may also grant parties an opportunity to properly provide support for an asserted fact. Fed. R. Civ. P. 56(e).

To prevail on a motion for summary judgment, the moving party must affirmatively identify those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 323-24. The moving party can satisfy this burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003). *See also id.* at 325.

If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts" to avoid summary judgment. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986)). Rather, the non-moving party must provide "sufficient evidence" for a jury to return a verdict in its favor; "if the [non-movant's] evidence is merely colorable or not significantly probative, summary judgment should be granted." *Id.* (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

## III. DISCUSSION

As a preliminary matter, the court notes that the Third Circuit interprets and treats state law discrimination actions under the PHRA as coextensive with the corresponding federal discrimination actions under the ADEA and the ADA. "While the Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, the ADA, or the ADEA . . . its courts nevertheless generally interpret the PHRA in accord with its federal counterparts." *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (citing *Gomez v. Allegheny Health Servs., Inc.*, 71

F.3d 1079, 1083-84 (3d Cir. 1995)). For purposes of the instant summary judgment motion, therefore, the court will address Counts I and III together, as they allege age discrimination in violation of federal and state law respectively. Similarly, the court will address Counts II and IV together, as they allege disability discrimination in violation of federal and state law respectively.

### A. Age Discrimination

CMC first moves for summary judgment as to the plaintiff's claims alleging age discrimination under the ADEA and the PHRA. The ADEA states, in relevant part, that "[i]t shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. §623(a)(1). In deciding a claim brought under the ADEA, the court applies the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See, e.g.*, *Fasold v. Justice*, 409 F.3d 178, 183-84 (3d Cir. 2005). Under this analytical framework, the employee must first present a *prima facie* case for discrimination by demonstrating by a preponderance of the evidence that she "(1) was a member of a protected class, [meaning] that she was over forty [years old], (2) is qualified for the position, (3) suffered an adverse employment decision, and (4) was ultimately replaced by a person sufficiently younger to permit an

inference of age discrimination." *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 166-67 (3d Cir. 2001) (citing *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 973 (3d Cir. 1988)). "To survive a motion for summary judgment, the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of the *prima facie* case." *Id.* (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)).

Where the employee is unable to establish a *prima facie* case, "no inference of discrimination is raised and the employer has no burden to proffer a reason for any action." *Spangle v. Valley Forge Sewer Auth.*, 839 F.2d 171, 174 (3d Cir. 1988). A valid *prima facie* case, however, "will create an initial inference of unlawful discrimination." *Duffy*, 265 F.3d at 167 n.1. "The burden of production then shifts to the employer, who can dispel the inference by articulating a legitimate, nondiscriminatory reason for its actions." *Id.* (citing *Connors*, 160 F.3d at 974 n.2). If the employer cannot satisfy this burden, then "judgment must be entered for the plaintiff." *Keller*, 130 F.3d at 1108. If the employer meets this burden, however, the burden shifts back again to the employee, who then must prove by a preponderance of the evidence that the employer's articulated reasons were a mere pretext for discrimination. *Duffy*, 265 F.3d at 167 n.1.

Here, the court's analysis on Weber's age discrimination claims cannot progress beyond step one of the *McDonnell Douglas* framework because Weber has not made out a *prima facie* case. Specifically, the fourth element of the *prima facie* case requires Weber to plead facts establishing that she was "ultimately replaced by a person sufficiently younger to permit an inference of age discrimination." *Id.* at 167. Weber, to the contrary, has failed to plead that anyone replaced her at all.

CMC relies on *Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 (3d Cir. 1983), to support the proposition that a plaintiff in an age discrimination case need not prove that she was replaced at all. (Doc. 53). However, the plaintiff in *Massarsky* was terminated due to a "reduction in force," meaning a company downsizing or mass layoffs. *Massarsky*, 706 F.2d at 118 n.13. In light of this factual circumstance, the Third Circuit noted that it would be "unnecessary for [the plaintiff] to follow the literal terms of the *McDonnell Douglas* model and show that [the plaintiff] was actually replaced by a younger employee." *Id.* The easing of this requirement for a *prima facie* case, however, does not apply across the board, and it does not apply here. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977) (explaining that "the facts necessarily will vary in [discrimination] cases, and the . . . *prima facie* proof required from a plaintiff is not necessarily applicable

in every respect to differing factual situations"). The Supreme Court has directly clarified this fourth element of the *prima facie* under the ADEA, deciding that while a plaintiff need not necessarily be replaced by someone who is "outside the protected class" (that is, younger than forty years old), the plaintiff still must be replaced by someone "substantially younger" such that it allows a reasonable factfinder to draw an inference of age discrimination. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (holding that a fifty-six-year-old worker who was replaced by a forty-year-old worker still lost out "because of his age" and thus stated a valid *prima facie* case of age discrimination).

Since Weber has not identified any replacement for her former position as an x-ray technician at CMC and since Weber's termination was not the result of a reduction in force, she has failed to provide sufficient evidence for a jury to return a verdict in her favor on her age discrimination claims. Accordingly, the court will grant CMC's motion for summary judgment as to Counts I and III.

### B. Disability Discrimination

CMC next moves for summary judgment as to the plaintiff's claims alleging disability discrimination under the ADA and the PHRA. The Third

Circuit has noted that "[i]n the context of employment discrimination, the ADA, [the] ADEA, and Title VII all serve the same purpose . . . [which is] to prohibit discrimination in employment against members of certain classes." *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 157 (3d Cir. 1995). "Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well." *Id.* Consequently, in assessing the plaintiff's claims for disability discrimination, the court adopts the same *McDonnell Douglas* burden-shifting framework mentioned above.

The ADA states, in relevant part, that employers may not "discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a). A *prima facie* case of discrimination under the ADA requires Weber to establish that she "(1) is a disabled person within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Gaul v. Lucent Technologies*, 134 F.3d 576, 580 (3d Cir. 1998)). The first element of the *prima facie* case can be satisfied if Weber, at

- 15 -

the time of her termination, either had an "impairment that substantially limits one or more major life activities" or was "regarded" by the CMC management "as having such an impairment." 42 U.S.C. §12102(1). Importantly, with respect to the final element of the *prima facie* case requiring Weber to prove that she was fired "as a result of discrimination," the Third Circuit has held that "this requirement necessarily implies that the plaintiff also must demonstrate that the employer knew of the disability." *Straining v. AT&T Wireless Servs., Inc.*, 144 F. App'x 229, 232 (3d Cir. 2005) (citing *Jones v. United Parcel Serv.*, 214 F.3d 402, 406 (3d Cir. 2000)). "It is, of course, an axiom of any ADA claim that the . . . employer be aware of the disability." *Jones*, 214 F.3d at 406.

The evidence of record here establishes a genuine dispute of material fact on Weber's *prima facie* case of disability discrimination, as it remains in dispute whether members of the CMC management actually knew about Weber's disability when they decided to terminate her. The only people who Weber directly informed about her impairments were Ewins, who was Weber's direct supervisor, and Powell, who was a human resources analyst. (Doc. 1; Doc. 52-5). In the chain of command at CMC, Ewins and Powell reported respectively to Bonczek and Wolfe, both of whom were decision-makers in Weber's firing. (Doc. 47). The Third Circuit has stated that "knowledge of one party cannot be imputed to another who is making the hiring decision," so the

knowledge of Ewins and Powell alone would not suffice to establish that the employer knew of Weber's disability. *Straining*, 144 F. App'x at 232 (citing *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 954 (3d Cir. 1996)).

However, this case presents additional facts to suggest that the CMC management nonetheless may have known about Weber's impairments. Specifically, Weber was covered in head-to-toe skin lesions. (Doc. 1; Doc. 52). Weber testified that the marks all over her skin were "very obvious and apparent . . . to everybody" and that people often "commented on them" to ask Weber whether she suffered from a disease. (Doc. 52-5). While CMC denies that any decision-makers had direct knowledge of Weber's disabilities, it is undisputed that Weber worked at CMC for roughly three years after developing these external, observable signs of illness. (Doc. 1; Doc. 7; Doc. 47). It is further undisputed that members of the CMC management were familiar with Weber and came into regular contact with her. (Doc. 47-3). Therefore, construing the facts and all reasonable inference in the light most favorable to the non-moving party, Weber has established a genuine issue of material fact for trial on her allegations of discrimination based on disability. *Andreoli*, 482 F.3d at 647.

This disputed fact is directly pertinent to both the first and final elements of Weber's *prima facie* case. Without a clear understanding of whether the

CMC management "regarded" Weber as having an impairment that substantially limited her major life activities, it is impossible to determine whether Weber was "disabled . . . within the meaning of the ADA."[3] *Taylor, 184 F.3d at 306.* Similarly, without a clear understanding of whether the CMC management knew that Weber suffered from these impairments, it is impossible to determine whether she was fired "as a result of discrimination." *Id.* Since this factual dispute arises with respect to Weber's *prima facie* case, the court will refrain from undertaking analyses of whether CMC's proffered reasons were legitimate or whether the allegations arising from the three patient incidents, all of which Weber disputes, constituted a mere pretext for unlawful discrimination under the latter two steps of the *McDonnell Douglas* framework.

---

[3] The court notes that neither party has briefed the issue of whether Weber was disabled under the ADA. CMC does mention in passing in a footnote that it "denies that either condition constitutes an impairment that substantially limited one of more of . . . Weber's major life activities within the meaning of the ADA or [the] PHRA." (Doc. 46). CMC, however, cites to no concrete evidence or case law to support this proposition, and neither party's substantive, numbered arguments focus on the issue of whether Weber was disabled or regarded as being disabled. The court must therefore consider this issue disputed for purposes of the instant summary judgment motion.

Disputes of material fact here preclude the entry of summary judgment on Weber's disability discrimination claims. Accordingly, the court will deny CMC's motion for summary judgment as to Counts II and IV.

## IV.  CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**. Specifically, the defendant's motion will be granted with respect to the plaintiff's claims for age discrimination arising under Counts I and III of the complaint. The defendant's motion will be denied with respect to the plaintiff's claims for disability discrimination arising under Counts II and IV of the complaint. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: November 2, 2017**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-0399-01.docx